### W. H. DILLMAN, Exr. *et al.*

*v.*

### KATHERINE McDANEL *et al.*

*Opinion filed June 14, 1906—Rehearing denied October 10, 1906.*

1. WILLS—*competency of proof of insanity of collateral blood relations of the testator.* If there is other evidence tending to show mental unsoundness of the testator it is competent to show the insanity of his collateral blood relations not further removed than uncles and aunts, without making proof that their insanity was hereditary in character.

2. SAME—*what tends to show unsoundness of mind.* The disposal, for little or no consideration and without apparent reason, of much valuable property by the testator after a severe illness which left him partly paralyzed, to persons to whom he was under no particular obligation, whereas prior to his illness he had been very close in his dealings and penurious in his habits, indicates a marked change of mentality and tends to show unsoundness of mind.

3. SAME—*competency of proof of declarations in conformity with will where mental capacity is in issue.* Where a will is attacked upon the ground of mental incapacity, proof of other wills

and of declarations of the testator conforming substantially to the disposition of the property made by the will in question should be confined to wills and declarations made at a time when the testator was conceded to be sane.

4. SAME—*when instruction as to mental incapacity is not misleading.* An instruction stating that any impairment of the mental faculties, or dementia, "which destroy testamentary capacity as defined in these instructions, disqualifies a person from making a will, even though it has not reached the stage of absolute imbecility," is not misleading, where the jury are fully instructed upon the subject of testamentary capacity and the effect of age, illness or physical weakness.

5. SAME—*testamentary capacity means capacity to make the particular will.* Unless the testator, at the time of making the will attacked, had such mind and memory as enabled him to understand the effect of that particular instrument upon his property he could not have understood the business upon which he was then engaged nor have possessed the required capacity to make the will.

6. SAME—*jury may consider evidence of will itself in connection with financial condition of testator's relatives.* The intrinsic evidence of the will itself, arising from the unreasonableness of its provisions, taking into view the state of the testator's property, family, claims of particular individuals and the known financial condition of the testator's relatives, may be considered by the jury in determining the question of testamentary capacity, where they have been correctly instructed as to the right of a sane person to dispose of his property as he pleases, without reference to his heirs.

7. SAME—*when instruction as to comparing testator's different mental attitudes is not misleading.* An instruction stating that the manner, talk and actions of the testator at a time when it is alleged he was not of sound mind should be compared with his manner, talk and actions at a time when he was conceded to be sane, in determining the question of his sanity, is not misleading, as tending to inform the jury that any change in such matters would establish the allegations of insanity or want of mental capacity.

8. SAME—*when instruction as to weight of evidence is harmless.* An instruction in a will case holding that "when witnesses are otherwise equally credible and their testimony otherwise is entitled to equal weight, greater weight and credit should be given to those whose means of information were superior and also to those who swear affirmatively to a fact rather than to those who swear negatively or to a want of knowledge," is harmless, where all witnesses for both parties gave affirmative evidence upon the subject of mental capacity and there was practically no dispute as to events and transactions.

APPEAL from the Circuit Court of Clay county; the Hon. S. L. DWIGHT, Judge, presiding.

B. D. MONROE, J. H. SMITH, and GEORGE B. GILLESPIE, for appellants.

ROSE & McCOLLUM, J. W. THOMASON, and DAWLEY, HUBBARD & WHEELER, for appellees.

Per CURIAM: Appellees, cousins and heirs-at-law of William H. Hudelson, deceased, filed their bill in the circuit court of Clay county to contest his last will and testament, and the codicil thereto, and to set aside the probate thereof, on the ground that the execution of the will was obtained by undue influence, and that the testator was mentally incompetent to make a will at the time of the execution of the will and at the time of the execution of the codicil. Appellants, being the executor of the will and legatees and devisees named in the will, and certain other persons who did not appeal, were made defendants. At the conclusion of all the evidence the court excluded from the jury all evidence on the question of undue influence, and the cause was submitted to the jury upon the issue of mental incapacity. A verdict was returned against the proponents. After overruling a motion for a new trial the court entered a decree in accordance with the verdict, and the proponents appeal to this court.

William H. Hudelson died March 9, 1905. The instrument in question purporting to be his last will and testament, with a codicil, was admitted to probate by the county court of Clay county on April 3, 1905. The bill herein was filed on June 15, 1905.

The deceased, at the time of his death, was seventy-nine years of age. He had resided in Clay county since 1852, and during the latter years of his life at Louisville, the county seat of that county. He was first married in 1852, and of that marriage his only child was born. That child died, however, before reaching adolescence, and the first wife died in

1854. He married again in 1858, and lived with the second wife, Penina, until May, 1903, when she died.

His heirs-at-law are all cousins, one of whom resides in Clay county and the others are non-residents of the State. While there is no evidence of any estrangement, his relations, during the latter years of his life, with those who are now his heirs-at-law were quite distant.

During the earlier years of his life in Clay county he was engaged in the mercantile business and in farming. Later he was a money lender, and engaged in discounting notes and buying and selling real estate, and in the banking business, and was a stockholder and director in the Farmers' and Merchants' Bank of Louisville at the time of his death, and latterly transacted his banking business with that bank.

Prior to December 24, 1902, he was a strong and healthy man. On that day he was taken ill and was sick for several months. During that time he suffered greatly from a carbuncle on the back of his neck and sustained what is denominated in the record a stroke of paralysis. As a result he lost the use of his left arm, and, to some extent, of other portions of his left side, and the contention of appellees is that ever after that illness he lacked mental capacity to make a valid disposition of his property by will. At the time of that illness he was worth between $175,000 and $200,000, but prior to his death he reduced his property, by gifts and conveyances made upon slight and inadequate consideration, to about $100,000, which consisted both of real and personal estate. Prior to this illness he had been very close in his dealings and was penurious in his habits. Such gifts as he made prior to that time were confined to recipients in some way connected with the Baptist church, of which he had been a member since 1868.

There is, and has been for many years, a Baptist college located at Ewing, Franklin county, Illinois, known as Ewing College, to which he had been a frequent contributor. At Sailor Springs, in Clay county, there was an academy

under the control of the same denomination. He purchased this institution, gave it the name of Hudelson Academy, and afterwards, prior to his illness, conveyed the property to and placed the academy under the management of Ewing College. In 1892 he established at Ewing a Baptist orphanage, and built cottages there to be used as dormitories for young ladies. Both the orphanage and the dormitories bear his second wife's name.

During the time intervening the illness above mentioned and his death, in addition to money and property which he gave to Ewing College and Hudelson Academy during that period, he gave to Dr. Scaiefe, under whose treatment he was for several months preceding his death, the sum of $15,000; to J. C. Meyers and wife, with whom he resided for a time after the death of his wife, he gave $10,000 and two farms, aggregating 184 acres, valued at $4600; to Ed Hawkins, who officed with W. H. Dillman, who was the attorney of the deceased, he surrendered notes that he held against him to the amount of $2200; to one Elston he surrendered a note of $150; to a woman by the name of Hobbs he surrendered a note which he held against her for $900; to Dr. Dillman, a brother of W. H. Dillman, he surrendered a note which he held against him for $900; to Joseph Murphy he surrendered notes which he held against him to the amount of $300; to Sumner Hayes he surrendered notes which he held against him to the amount of $3000; to Dr. Lauchner he surrendered a note which he held against him for $100. It does not appear but that all of these notes were collectible. He conveyed without consideration a small tract of land, about ten acres, the value of which is not fixed by the record, to one George McClure.

In May, 1904, he made a trip to Arkansas to examine some real estate which he owned there. He was absent one week, and J. C. Zink, of Clay county, accompanied him to assist in the inspection of the land. On their return Mr. Hudelson proposed to give to Zink a tract of land on Hoosier

Prairie, in Clay county. Hudelson was then going to Sailor Springs, which was known locally as a health resort, and Zink told him to go there and rest awhile, and when he came back, if he wanted to do anything like that, Zink would see about it. Hudelson never renewed this offer, but he afterwards said to Zink that he, Zink, would be well taken care of and never allowed to suffer. Nothing was ever done in pursuance of this promise.

For several years prior to his death W. H. Dillman had been his attorney. He made his business headquarters at Dillman's office, in Louisville, and both before and after the illness above mentioned, Dillman, who at the time of the trial of this case was thirty-seven years of age, assisted him in the transaction of his business, which was principally that connected with loaning and collecting money. During the period of his life now under investigation he surrendered to Dillman a note for $600. He also held a note against Dillman for $2800. After that note had been partly paid he traded it to Dillman for stock in a gold mine situated in the Wichita mountains. This stock Dillman, as executor, listed in his inventory as "doubtful." After his trip to Arkansas he traded the Arkansas land, which was 880 acres in extent, to Mr. Dillman. A deed was executed and Dillman gave his obligations for the land. Hudelson, for some reason which the record does not disclose, became dissatisfied with the arrangement before the transaction was finally closed, and with Dillman's consent the deeds and obligations were destroyed. Afterwards he wrote to Dillman, asking him to prepare another deed for the Arkansas land and to bring it over to Sailor Springs, where Hudelson then was, for execution. Dillman complied with the request, thinking, as he says, that Hudelson had concluded to carry out the trade the same as before, and when he saw Hudelson at Sailor Springs the latter asked whether he brought the deed. Dillman replied in the affirmative, and asked whether Hudelson desired to trade as he said he would. Hudelson said no, and told Dill-

man that he had concluded to deed him the Arkansas land, and the conveyance was executed and delivered on that day.

We think it apparent from the testimony of Mr. Dillman, who was called by appellees, that there was in fact no valuable consideration for this deed. While he says that Mr. Hudelson expressed gratitude for his kindness to him, and that he, Dillman, did not regard it as a straight gift, yet he also says that at that time he, Dillman, "had no particular bill against him; he seemed to think a good deal of me." This land cost Mr. Hudelson about $9000, and the consideration expressed in the deed to Dillman is $12,000. It appears that Dillman had been compensated for his services to Mr. Hudelson otherwise than by the gifts and conveyances above mentioned.

During the period succeeding his illness it appears that Mr. Hudelson himself transacted considerable business. The record shows that during that period he drew and signed twelve checks on the Farmers' and Merchants' Bank, and that nineteen other checks drawn on that bank were written by other persons at his request and signed by him, and that all were paid on presentation. This does not include a $5000 check hereinafter mentioned. During that time he executed deeds, bonds for deeds, took notes, released mortgages, and with the assistance of Mr. Dillman managed financial affairs which amounted in the aggregate to many thousand dollars. Many of those with whom he dealt during that time were witnesses. Some of them were of the opinion that he was entirely competent to transact ordinary business. Others gave it as their opinion, based upon what they saw and observed of him, that he lacked testamentary capacity. Among the latter were some of those in the active management of the bank in question. Part of the property given to Dr. Scaiefe was $5000 in cash, which was transferred to him by a check on that bank. When that was presented the bank at first refused to pay it, making an endorsement thereon, signed by several of the directors, to the

effect that the payment was refused, not on account of lack of funds, but because of Mr. Hudelson's mental condition. Later, after communicating with Mr. Hudelson, the bank paid this check.

Medical experts testified both for proponents and contestants, and, as usual, testimony of those called for the will indicates that Mr. Hudelson had the requisite mental capacity, while the testimony of those called against the will tends to show that he lacked that capacity. A multitude of circumstances are recited by the various witnesses, many of which tend to establish a lack of testamentary capacity on the part of the deceased and many others of which are entirely consistent with sanity.

The instrument in controversy was executed on February 4, 1904. By it Mr. Hudelson sought to bequeath and devise his property as follows: To Mrs. J. C. Meyers, the wife of J. C. Meyers above mentioned, the sum of $2000. In trust for the benefit of Hudelson Academy, the sum of $6000; in trust for the benefit of Hudelson Home, the orphanage above mentioned, the sum of $10,000; in trust for the purpose of carrying on the work of evangelism according to the Baptist doctrine, the sum of $10,000; in trust for the permanent endowment of the Dr. John Washburn chair of ancient languages in Ewing College, the sum of $5000; and the residue of his estate in trust for the benefit of Ewing College. Each of these devises or bequests which are in trust, except that for the permanent endowment of the chair of ancient languages, is upon the happening of a certain contingency to pass to and become the property of the American Baptist Missionary Union of Boston, Massachusetts. James M. Sappenfield was nominated for executor of this will. Upon the death of Mr. Sappenfield Mr. Hudelson executed a codicil on the 29th day of May, 1904, nominating Mr. Dillman as executor of the will.

Two other wills executed by Mr. Hudelson were offered in evidence. One was dated January 9, 1894, and the other

July 15, 1903. By each of these wills practically his entire estate was given to Ewing College and charities connected with the Baptist church. By the will executed in 1903 the entire estate was devised to W. H. Dillman in trust, to be held and managed by him for a period of twenty years, excepting a bequest of $800 to Mrs. J. C. Meyers, the wife of J. C. Meyers above mentioned, which was to be paid as soon as the executor could conveniently do so.

Evidence was introduced showing that Mr. Hudelson had frequently expressed a purpose of bequeathing his property to Ewing College and to other charities of the character of those mentioned in each of the three wills. Other evidence was introduced showing that he had made various other statements showing that his purpose was to make certain bequests to various persons, none of which appear in the instrument attacked in this case.

At the close of all the evidence proponents moved the court to instruct the jury to return a verdict in their favor. This motion was denied, and the action of the court in this regard is assigned as error; and it is further urged that if this assignment be not meritorious the verdict was contrary to the clear preponderance of the evidence, and that the decree should be reversed for that reason.

A large number of witnesses testified in this cause. The original abstract contains 474 pages. An additional abstract has been filed containing 70 pages. We have read the testimony of the various witnesses as set out in these abstracts. On account of the volume of the evidence it is impossible to discuss and analyze it in this opinion. There was a marked variance between the conclusions of those who spoke for the proponents and those who were called by the contestants. In our judgment the evidence tends to support the averments of the bill in reference to mental incapacity, and the verdict is not manifestly against the weight of the evidence. We have been moved to this conclusion largely by the fact that the gifts and conveyances made by the deceased after the ill-

ness which began in 1902, other than those to Ewing College
and Hudelson Academy, indicate a marked change in his
mentality, and tend strongly to show that he was not, during
that period, of sound mind and memory.  Efforts were made
to show some reason for some of these gifts.  None of these
reasons are such as, in our judgment, would move a man of
the character and habits of William H. Hudelson so long
as his mind was sound.

Wesley R. Baldridge, a witness for contestants, was per-
mitted, over objection, to testify that Jane Devin, a paternal
aunt of the deceased, was "crazy" for a period of eighteen
months and then recovered, and it is urged that this evidence
was incompetent for the reason that it was not supplemented
by any evidence showing that the insanity from which the
aunt suffered was of a kind that was hereditary, and that in
any event the disease could not have been transmitted from
her to the deceased.  The precedents are not a unit on this
question, but we think the greater weight of authority is, that
where the sanity or insanity of an individual is the subject
of judicial investigation, and there is other evidence tending
to show mental unsoundness, it is competent to show the in-
sanity of his collateral blood relations, not further removed
than uncles and aunts, without making proof that the insan-
ity from which they suffered was hereditary in character.
16 Am. & Eng. Ency. of Law, (2d ed.) 613; Rogers on
Expert Testimony, sec. 60; 1 Wharton & Stille on Medical
Jurisprudence, sec. 580; *People* v. *Garbutt,* 17 Mich. 9;
*Prentis* v. *Bates,* 93 id. 234; *State* v. *Simms,* 68 Mo. 305;
*Baxter* v. *Abbott,* 7 Gray, 71; *Hagan* v. *State,* 5 Baxt. 615.

There was also evidence, which was received without
objection, that Sarah E. Hudelson, a cousin of the deceased,
had been insane for a great many years and was so at the
time of the trial.

The court refused the first instruction requested by appel-
lants, which was in the words following:

"The law is, that to be of sound and disposing mind and memory, so as to be capable of making a valid will, it is sufficient that the testator has an understanding of the nature of the business in which he is engaged, a recollection of the property he means to dispose of, of the persons who are the objects of his bounty, and the manner in which it is to be distributed among them. It is not necessary that he should comprehend the provisions of his will in their legal form; it is sufficient if he understands the actual disposition which he is making of his property at the time."

We think the last sentence in this instruction apt to mislead the jury. By instruction No. 19, however, given at the request of appellants, the jury were instructed that if the deceased, at the time of executing the will, "knew what he was doing and executed it as his will, understanding its nature and effects, and had sufficient mind and memory," etc., then the jury should find the paper in dispute to be his will. We think this instruction stated the proposition embodied in the last sentence of the first instruction, and stated it in unobjectionable form. Several other instructions given laid down the correct rule for determining the testamentary capacity of the deceased. There was, therefore, no error in the refusal of appellants' first instruction.

Appellants' tenth instruction, as requested, reads as follows:

"The court instructs the jury that if you believe, from the evidence, that the said William H. Hudelson did, prior to the making of the will in question, make other wills, *the provisions of which are in substantial conformity to the will in question*, then it is your duty to take into consideration the fact of the execution of such former wills, if any are proven, together with all the other facts and circumstances proved on the trial."

The court modified it by striking out the words italicized and gave it as modified. Appellants' sixteenth instruction was one of the same character, advising the jury that if the

deceased, before executing the paper in question, "had expressed any fixed purposes and intentions regarding the disposition of his property, *approximating very nearly to the provisions of the will which is contested,* then the jury should consider such expressed purposes and intentions, if such appear from the evidence; and if the jury find that such expressed purposes and declarations of the testator are in accordance with the provisions of the will in question, then such declarations should be weighed by the jury in determining the question of sanity," etc. The court modified this instruction by striking out the italicized words and gave the instruction as modified. Complaint is made of both of these modifications.

These instructions should both have been refused, for the reason that they did not confine the jury to the consideration of prior wills executed and purposes and intentions expressed at a time when the deceased was conceded to be competent to make a will. The substance of the language stricken out of the tenth instruction, however, is found in the seventh given by the court at the request of the contestants, where the jury are told that the fact, if it be a fact, that the deceased "had formerly made other wills substantially like the one in controversy may be considered by you upon the question of mental capacity," but that such fact would not be conclusive, etc. The language stricken out of the sixteenth did not change its meaning, as the jury were advised by that instruction, as given, that it was proper to consider the expressed purposes and declarations of the testator which were "in accordance with the provisions of the will in question."

Complaint is also made of the action of the court in giving certain instructions requested by appellees. The first of these is appellees' No. 3, which advises the jury that any impairment of the mental faculties, or dementia, "which destroy testamentary capacity as defined in these instructions, disqualifies a person from making a will, even though it has

not reached the stage of absolute imbecility." It is said that this instruction is misleading as to the legal test of competency to make a will, and that by this instruction mere old age or any impairment of the mental faculties is sufficient to render one incompetent. We think this a misapprehension. The instruction merely advised the jury that the lack of testamentary capacity disqualifies, even though the incapacity does not amount to absolute imbecility. By propositions of law given for the appellants the jury were fully advised that neither illness, age, physical weakness nor mental weakness rendered the deceased incapable of making a will unless the mental weakness left the testator without the testamentary capacity defined by the instructions.

Appellees' instruction No. 4 reads as follows:

"The court instructs the jury that the capacity to comprehend a few simple details, if the estate be small, might qualify a person, in that case, to intelligently dispose of his property by will, while if the estate be large, requiring the remembrance of many facts and the comprehension of many details, and the disposition to be made is complicated, the same mental capacity may be wholly insufficient to the intelligent understanding of the business requisite to the making of a valid will."

It is said that this violates the law laid down in the case of *Yoe* v. *McCord,* 74 Ill. 33, where it was said that one grossly ignorant or of very limited mental capacity, if otherwise of sane mind, may make any instrument, however complex it may be, and be bound thereby, and where this court approved the rule as held in *Delafield* v. *Parish,* 25 N. Y. 9, "that the question is, had the testator, as *compos mentis,* capacity to make a will; not, had he capacity to make the will produced." This view has not been followed by the later authorities where the question of sanity is involved.

In *Campbell* v. *Campbell,* 130 Ill. 466, it is said (p. 480) : "The capacity to comprehend a few simple details may in one case suffice to enable the party to intelligently dispose

of his property by contract or will, while in another case, if the estate be large, requiring the remembrance of many facts and the comprehension of many details, and the disposition to be made is complicated, the same mental capacity may be wholly insufficient to that intelligent understanding of the business requisite to the making of a valid will." To the same effect are *Campbell* v. *Campbell,* 138 Ill. 612, and *Taylor* v. *Pegram,* 151 id. 106.

Unless the person whose testamentary capacity is questioned had, at the time of making his will, such mind and memory as enabled him to understand the business in which he was then engaged and the effect of the disposition made by him of his property he did not possess the sound mind and memory required by the statute. The business in which he was then engaged was that of disposing of his property by the instrument in writing which is attacked, and it is manifest that he could not understand that business unless he had sufficient mental capacity to understand the effect of that particular instrument upon his property.

Instructions numbered 5 and 18 for appellees advised the jury that they might take into consideration, in determining the question of mental capacity, any inequality of distribution or unreasonableness of the provisions of the will, and the reasonableness of the will with reference to the amount of the testator's property and the situation and condition, financially, of his relatives. Evidence was introduced which showed that the deceased had knowledge of the situation and condition, financially, of some of his relatives. Instructions were given at the request of appellants which embodied the same propositions as contained in the two here criticised, except that in those given at the request of appellants the jury were not directed to consider the reasonableness of the will with reference to the situation and condition, financially, of his relatives. We have held that in cases of this character, "intrinsic evidence of the will itself, arising from the unreasonableness or injustice of its provisions, tak-

ing into view the state of the testator's property, family and the claims of particular individuals, is competent and proper for the consideration of the jury." (*McCommon* v. *Mc-Common,* 151 Ill. 428; *French* v. *French,* 215 id. 470.) The financial condition of the testator's relatives falls within the language quoted.

At the request of the appellants the jury were instructed that the next of kin had no legal or natural right to the estate of the deceased; that the law of the land gives to each person the power to make such final disposition of his estate by his last will and testament as he may choose, and that the owner of property having the requisite mental capacity has the power to disinherit his heirs and leave his property to charitable and educational objects, and that if he does so, the validity of his will is not thereby affected. The instructions, as a series, correctly stated the law bearing upon the subjects touched by appellees' instructions numbered 5 and 18, now under consideration.

The objections made to instructions 2, 15 and 17 given at the request of appellees are disposed of adversely to the contention of appellants by what has already been said.

Appellees' instruction No. 14 reads as follows:

"The court instructs you that in determining whether or not a man is of sound mind and memory he should be compared with himself, and not with others. His manner, talk and actions at a time when it is alleged he was not of sound mind and memory should be compared with his manner, talk and action at a time when his sanity was not questioned."

It is said that this instruction is misleading from the fact that before Mr. Hudelson was sick, in the winter of 1902-03, he was a strong and vigorous man, above the average in point of intelligence; that thereafter he was physically ill, and that the jury were given to understand by this instruction that if they found physical and mental changes they should consider the allegations of insanity, or want of men-

tal capacity, established. It seems impossible that the jury could have given any such meaning to this instruction. We think the objection is without merit.

Instruction No. 19 given for appellees reads:

"The court instructs the jury that when witnesses are otherwise equally creditable and their testimony otherwise is entitled to equal weight, greater weight and credit should be given to those whose means of information were superior, and also to those who swear affirmatively to a fact rather than to those who swear negatively or to a want of knowledge."

The giving of this instruction, in our judgment, was harmless. The witnesses who testified that in their opinion the deceased was sane; the witnesses who testified that in their opinion he lacked testamentary capacity; the witnesses who testified to facts and circumstances from which an inference of sanity might be drawn; the witnesses who testified to facts and circumstances from which an inference of mental unsoundness might be drawn; the expert witnesses who testified, in response to a hypothetical question, that he was sane, and the expert witnesses who testified, in response to a hypothetical question, that he was of unsound mind, were all witnesses who gave affirmative or positive evidence. *Frizell* v. *Cole,* 42 Ill. 362.

If, as contended by appellants, this instruction directed the jury to give undue weight to the testimony of those who swore affirmatively, appellees did not thereby obtain any greater advantage than did appellants, because all the witnesses of both parties who testified to material matters were witnesses who swore affirmatively. This is not a case where there is a dispute as to whether or not a certain thing transpired. Counsel have not pointed out, nor have we observed in reading the testimony, a single instance where witnesses have sworn that a certain event occurred, and other witnesses, present at the time, testified that the event did not occur or that they did not notice that it occurred.

One respect in which appellants deem the instruction harmful is this: Witnesses for the appellees testified that at the times when they observed the deceased the left corner of his eye was drawn down and his mouth was drawn down on the left side of his face; that his eyes had lost their natural expression and had a glazed and staring appearance, and that his conversation indicated failing mental powers. Witnesses who testified for appellants, on the other hand, testified that they observed the deceased; that the left corner of his eye was not drawn down; that his mouth was not drawn down on the left side of his face; that his eyes did not have a glazed and staring appearance, and that in their conversation with him there was nothing to indicate failing mental powers. Appellants contend that, within the meaning of this instruction, their witnesses just referred to would be regarded by the jury as those who gave negative testimony, and those who testified for appellees in reference to these matters would be regarded by the jury as those who gave affirmative testimony.

The testimony of appellees' witnesses and the testimony of appellants' witnesses did not relate to the same times and conversations. There was therefore no conflict between them, and those who testified for appellants could not be regarded as witnesses swearing negatively, when considered in connection with those who testified for appellees in regard to the matters just mentioned. It is apparent from this record that the deceased was stronger, both physically and mentally, at some times than he was at others, and the difference in the testimony which has just been noted is perhaps explainable by this fact. If witnesses for appellants and witnesses for appellees, and the deceased, had all been present on the same occasion, and witnesses for appellees had testified that the peculiarities and failings of the deceased which we have last above mentioned existed and were observed by them on that occasion, and witnesses for appellants had testified that on that occasion those peculiarities and failings

did not exist or that they did not observe them, then argument of counsel for appellants bearing on this instruction would be entitled to weight. This is a case where there is practically no dispute in reference to events and transactions. The conflict is in regard to the inference that is to be drawn from those events and transactions.

Upon consideration of all the instructions given we conclude that appellants have no just cause of complaint on account of the action of the court in stating the law to the jury.

No assignments of error other than those which we have discussed in this opinion have been called to our attention by the brief and argument of appellants.

The decree of the circuit court will be affirmed.

*Decree affirmed.*