Jim B. EDMONDS, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 14004.

United States Court of Appeals
District of Columbia Circuit.

Reargued April 23, 1958.

Decided Sept. 15, 1958.

Mr. Edward J. Skeens, Washington, D. C., with whom Mr. Leo Michael Linehan, Washington, D. C., was on the brief, for appellant. Mr. Carl J. Morano, Washington, D. C., also entered an appearance for appellant.

Mr. Fred L. McIntyre, Asst. U. S. Atty., for appellee. Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll and Alexander L. Stevas, Asst. U. S. Attys., were on the brief for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting in banc.

PER CURIAM.

The judgment of conviction is reversed and the case is remanded for a new trial. Circuit Judge Bazelon, with whom Chief Judge Edgerton and Circuit Judges Fahy and Washington concur, files an opinion in support of the judgment of reversal. Circuit Judges Prettyman and Burger concur in the result. Circuit Judge Wilbur K. Miller, with whom Circuit Judges Danaher and Bastian join, files an opinion dissenting from the judgment of reversal.

BAZELON, Circuit Judge, with whom EDGERTON, Chief Judge, FAHY and WASHINGTON, Circuit Judges, join: Appellant, a 19-year old Marine, seeks reversal of his conviction of second-degree murder after trial upon charges of first-degree murder.

While stationed at the Marine Barracks, Washington, D. C., in November 1956, appellant was referred by his commanding officer to a naval psychiatrist for a neuropsychiatric consultation because of his behavior problems. After a thirty to forty-five minute consultation on November 16, 1956, the psychiatrist reported:

"His pertinent past history reveals an extremely traumatic childhood. His father killed his mother with a gun while in a drunken rage in the patient's presence at age eight years.

The patient was subsequently involved in the trial. The father recently completed 10 years of imprisonment. His school record was poor and his social activities were impulsive and isolated.

"On examination he was tense, bewildered and guarded. There was no evidence of a mood, affect or thinking disorder. His thinking was disorganized, erratic and he appeared on the verge of explosive rage and fear. He gives the impression of a confused, impulsive, immature young man who is coping with thinly disguised, overwhelming fear of his father and simultaneously violently aggressive fantasies towards him. He appears to have struggled with this conflict since early childhood but since release of his father from prison the conflict has erupted into his overt behavior. His current difficulties in the Marine Corps seem significantly related to this.

"It is my opinion that a transfer to another post is unlikely to enable him to adjust to the Marine Corps. There is the further possibility of violent loss of emotional control in relation to his father. He should be hospitalized for further observation for his own welfare, and whenever feasible should be separated from Service.

"Impression: Emotional Instability Reaction with Anxiety Features."

The next day, a Saturday, appellant went AWOL with the intention of going to Georgia to see his grandmother. He went to a bar where he had a few drinks and met a friend, one Price. The next few hours were spent in Price's company, first at a dance and later at Price's apartment. About 2:30 Sunday morning appellant left Price's apartment and went to the home of a girl friend, intending to sleep there. Finding that she was not at home, he decided to take a taxi back to his barracks and turn himself in as AWOL.

While waiting for a taxi, he was approached by Mr. Lefebvre, the deceased, and was invited to the latter's nearby apartment for coffee. He accepted the invitation. After they had coffee, according to appellant, Mr. Lefebvre began to make homosexual advances and there resulted a struggle in the course of which appellant choked Mr. Lefebvre to death. Thereafter appellant took from the apartment some money, a radio and the keys to the deceased's automobile, which was parked outside, and drove the automobile, to Georgia. There he drove the automobile into an embankment in what he says was an attempt at suicide. The car was wrecked and appellant was hospitalized. The report of this accident was what led the police to appellant and brought his arrest for the killing.

Appellant was indicted for first-degree murder and, on April 29, 1957, went on trial for his life. His defenses were justifiable homicide and insanity. The justifiable homicide defense was based on a contention that he had killed Lefebvre in resisting the latter's homosexual attack. The theory of the insanity defense was that the killing was attributable to appellant's mental derangement traceable to the childhood traumatic experience referred to in the naval psychiatrist's report quoted supra. We have studied the record of the trial with great care. See Williams v. United States, 1942, 76 U.S.App.D.C. 299, 300, 131 F.2d 21, 22. In our opinion, the Government exceeded permissible bounds in its efforts to refute the defenses, so tainting the jury's verdict as to require reversal of the conviction and remand of the case for a new trial.

### The Justifiable Homicide Defense

Appellant testified that Lefebvre made a series of homosexual advances to him, becoming more aggressive as appellant repulsed him, and finally pouncing on appellant and trying to take him by force. Appellant claimed that he choked Lefebvre in resisting this forcible attack. The Government's theory was that, while

resistance to a homosexual attack may in some circumstances justify homicide, appellant had not, in fact, resisted Lefebvre's homosexual advances. He had demurred, the Government contends, only to Lefebvre's attempts to kiss him, which would hardly justify killing.

To establish its contention, the Government first sought an admission from appellant on cross-examination that he had told Dr. William G. Cushard that he had objected only to the kissing. This admission not being forthcoming, the Government called Dr. Cushard as a witness for the purpose of showing "what the defendant said to him concerning the activities of the deceased, that he didn't object to the man fondling him; that it was the kissing he objected to." Over defense objections, Dr. Cushard was permitted to testify that appellant had told him it was Lefebvre's "method of approach" he had found objectionable. Dr. Cushard's testimony was used to advantage in the Government's argument to the jury. The prosecutor said:

"* * * you need only refer or refresh your recollection of the testimony of Doctor Cushard late yesterday afternoon when asked what the feelings of the defendant were as represented to Doctor Cushard concerning these so-called, as he termed it, 'improper advances'.

"He objected to the method of approach! Nowhere does he say to Doctor Cushard, as he testified, that this defendant 'objected' to the deceased fondling him; but he objected to the 'method of approach'! Nowhere does he say his testicles and penis were being squeezed and he was in pain! * * *"

Defense counsel objected to this whole line of inquiry, pointing out that Dr. Cushard had examined appellant for the purpose of determining his competency to stand trial and citing the provision of 18 U.S.C. § 4244 that: "No statement made by the accused in the course of any examination into his sanity or men-

tal competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding. * * *" The District Court overruled the objection on the ground that the Act of August 9, 1955, 69 Stat. 609, 612, amending D.C.Code § 14–308, superseded the quoted provision of 18 U.S.C. § 4244.

D.C.Code § 14–308 established the physician-patient privilege. The 1955 amendment to this section provides:

"That this section shall not apply to *evidence relating to the mental competency or sanity of an accused* in criminal trials where the accused raises the defense of insanity * * *." [Emphasis supplied.]

There is no conflict between this provision and the provision of 18 U.S.C. § 4244 barring a doctor's revelation of the accused's statements relating to "guilt." The legislative history of the Act of August 9, 1955, makes it clear and explicit that Congress meant to remove the privilege from statements relevant to mental competency or sanity, but to leave privileged statements relevant to the issue of guilt or innocence. The Committee on Mental Disorder as a Criminal Defense, Council on Law Enforcement of the District of Columbia, which drafted the legislation, said in its Report of April 25, 1955, which was adopted by both the House and Senate Committee Reports in recommending the legislation:

"It is to be noted that this recommendation pertains only to evidence as to mental competency or sanity. All other existing privileges would be retained, including the provision in 18 U.S.C. [§] 4244, that no statement made by an accused to a physician in the course of an examination should be admitted in evidence against the accused on the issue of guilt in any criminal proceedings." [1]

1. H.R.Rep. No. 892, 84th Cong., 1st Sess., June 22, 1955, p. 16; S.Rep. No. 1170, 84th Cong., 1st Sess., July 27, 1955, p. 16.

As the Report further said, " \* \* \* many difficult questions may be presented to the trial courts in determining whether a particular statement bears on the mental competency or sanity of an accused or whether it bears on his guilt. The Committee is quite confident that our very able trial courts will be able to decide these questions properly in each individual case as they arise." [2]

In the instant case, the trial judge, since he erroneously assumed that the amendment destroyed all privilege in a case where sanity is in issue, did not undertake to decide whether the statement Dr. Cushard testified to related to sanity or to guilt. Had he considered that question, he would have reached the only conclusion possible from the record—that the statement bore on guilt and not on sanity and, therefore, the statement was not made admissible by the amendment.

The circumstances of this case require some further discussion of the question of the admissibility of Dr. Cushard's testimony. Dr. Cushard had examined appellant at the jail on December 7, 1956, at the request of the United States Attorney, before appellant was indicted and before he had counsel. The doctor made a report of his findings to the United States Attorney who had retained him, rather than to the court. Ten days later, after appellant had obtained counsel, they moved under 18 U.S.C. § 4244 for a mental examination to determine his trial competency. The District Court, reciting as authority D.C.Code, § 24–301, as amended August 9, 1955, rather than 18 U.S.C. § 4244, committed appellant

to St. Elizabeths Hospital for a period not to exceed sixty days for the purpose of mental examination. Dr. Cushard, who, in his private capacity, had made the December 7 jail examination, participated, as a member of the St. Elizabeths Hospital staff, in the examinations made pursuant to this commitment order. He had heard appellant's statements both in the private examination and in the court-ordered examination. The prosecutor carefully avoided eliciting evidence from the doctor as to any admission made by appellant during the court-ordered examination. He stated as a preface to his questions, ". . . I will ask you to limit your answers . . strictly to the visit you had with the defendant at the District of Columbia Jail on December the 7th."

If the statements testified to by the doctor were made in connection with an examination under 18 U.S.C. § 4244, the testimony would unquestionably have been barred under the clear language of the statute. This statutory bar would also have applied if the examination were made under D.C.Code, § 24–301, for although that statute does not contain the barring proviso, 18 U.S.C. § 4244, which was intended to provide uniform procedure in the Federal courts, Jordan v. United States, 1953, 93 U.S. App.D.C. 65, 68, 207 F.2d 28, 31–32 affirming United States v. Jordan, D.D.C. 1953, 109 F.Supp. 528, would supply the omission. See legislative history quoted supra.[3] The question now arises whether the Government, by-passing both statutes by having a private psychiatric examination made, may deprive the accused

---

**2.** Ibid.

**3.** The Government argues that the 1955 amendment of D.C.Code § 24–301 would make the statement admissible. It refers to subdivision (h) of the amended statute, which reads: "The provisions of this section shall supersede in the District of Columbia the provisions of any Federal statutes or parts thereof inconsistent with this section." The purpose of that subdivision is not in doubt. It was "to assure that there be prima facie evidence before the court to support a motion to commit the accused for mental observation." H.R.Rep. No. 892, 84th Cong., 1st Sess., June 22, 1955, p. 3; S.Rep. No. 1170, 84th Cong., 1st Sess., July 27, 1955, p. 3. This expression of purpose is ignored by the Government, as is also the explicit understanding of the proponents of the 1955 amendment and the Committees of both the House and the Senate that the amendment was to leave unaffected § 4244's bar against statements relating to guilt. See text at note 1, supra.

of the protection he would have had if the statutory procedures had been employed. We hold that the statutory policy that statements made by the accused to the examining psychiatrist should not be admitted against him on the issue of guilt may not be defeated by using non-statutory procedure.

As to whether it is proper for the prosecution to have psychiatric examinations of the accused made on its own authority, rather than proceeding by authority of the District Court under statutory procedures, we express no view. We think, however, that, if such an examination is made, the better practice would be to obtain the consent of defense counsel and if, as here, the accused is without counsel, to let him retain counsel or have counsel appointed for him before proceeding with the examination. See Leyra v. Denno, 1954, 347 U.S. 556, 561, 74 S.Ct. 716, 98 L.Ed. 948.

We think, also, that better practice would require the prosecutor, upon receiving the psychiatrist's report, to transmit a copy to the defense without delay. In the instant case, Dr. Cushard's report was not shown to the defense until the fifth day of the trial, after defense counsel, having learned of it in some undisclosed fashion, demanded to see it. Withholding the report was inexcusable, especially in view of a pretrial order by the District Court requiring the Government to produce a week before trial "any and all statements of potential Government witnesses."[4] Even if the withholding of the report would have justified preclusion of Dr. Cushard's testimony relating to the December 7 examination, a question we do not decide, we cannot say that the withholding was so prejudicial to the defense[5] as itself to require reversal. We hold only that it was error to receive in evidence on the issue of guilt the doctor's testimony concerning statements made by

appellant in the course of that examination.

### The Insanity Defense

In support of his insanity defense, appellant called his older brother who testified that, when appellant was seven and one-half years old, their father had shot their mother, in appellant's presence, as she sat in their home with their nine-month old baby sister in her arms. The brother testified further that appellant had testified for the prosecution at the father's two murder trials, the first resulting in a death sentence and the second in life imprisonment.

On cross-examination, the Government elicited from appellant's brother the facts that their father's defense had been insanity and that the jury had rejected it. The asserted justification of the Government's questions about the father's defense was that the Government "had a right to test the credibility of this witness to determine whether he was there throughout this trial as he testified he was." Because appellant's counsel had elicited from the witness on direct "parts of the testimony" at the father's trial, the Government claimed the "right to go into the rest of it for whatever it was worth."

Appellant moved for a mistrial, pointing out the obvious prejudice to his insanity defense resulting from the irrelevant circumstances that his father, tried on a similar charge some twelve years earlier, had raised a similar defense and that the jury had rejected it. The Government, in contesting the mistrial motion, conceded that its purpose in introducing evidence relating to the father's defense was to prejudice appellant's insanity defense, but claimed a right to the advantage of such prejudice. Appellant's counsel, said the prosecutor, "wants to sift the chaff from the wheat; he wants everything to come in that is

---

4. The prosecutor explained that the report was in the wrong file, but he also said that it came to his attention "in preparing the trial not too long before trial time."

5. The defense had the report four days before the Government offered Dr. Cushard's testimony.

good for his client, but the bad part he wants the Government limited."

What was "good" for the appellant—that as a young child he had been subjected to an experience of extreme horror—was clearly relevant to his insanity defense. What was "bad" for the appellant—that his father had pleaded insanity—was clearly irrelevant to any of the issues of appellant's trial. To receive evidence which is irrelevant to the issue and is "bad" for the accused is plainly improper. The trial court not only denied the motion for a mistrial but neglected even to instruct the jury to disregard the improper evidence.

Reversed and remanded for a new trial.

WILBUR K. MILLER, Circuit Judge, with whom DANAHER and BASTIAN, Circuit Judges, concur, dissenting from the judgment: In protesting against the reversal of this conviction, I shall direct my attention principally to the preceding statement by Judge Bazelon, although it is not the opinion of a majority of the court as it is concurred in only by Chief Judge Edgerton and by Judges Fahy and Washington. Judges Prettyman and Burger merely concur in the reversal.

Judge Bazelon says "it was error to receive in evidence on the issue of guilt the doctor's testimony concerning statements made by appellant in the course of that [December 7] examination." He also thinks the plea of insanity made by Edmonds' father in a criminal prosecution many years ago "was clearly irrelevant to any of the issues of appellant's trial" and that cross-examination of appellant's witness which elicited the fact that the father unsuccessfully pleaded insanity was erroneously permitted. He says on this score: "To receive evidence which is irrelevant to the issue *and is* '*bad*' *for the accused* is plainly improper." (My emphasis.) Apparently he thinks the alleged errors were prejudicial as well, as he favors reversal and remand because of them. I disagree on both counts and shall discuss the two alleged errors in the order named.

1. With respect to what Judge Bazelon's opinion denominates "The Justifiable Homicide Defense," I call attention to the fact that Dr. Cushard's testimony concerning appellant's statement to him (the receipt of which Judge Bazelon brands as error because he says it bore on the issue of appellant's guilt and so was admitted in violation of 18 U.S.C. § 4244, which he thinks applies) was merely cumulative and therefore, even if erroneously received, was not prejudicial to the appellant, unless it can be thought to have substantially influenced the jury's verdict. I show hereinafter the improbability that it played any part in the decision of the jurors.

The cumulative nature of the criticized testimony of the expert becomes apparent when it is compared with the earlier testimony of another witness. The following excerpt from Dr. Cushard's testimony concerning a statement made to him by the appellant in the course of his examination of December 7 is that which Judge Bazelon's opinion says was erroneously received:

"Q. What if anything did the defendant tell you at that time at the jail concerning his feelings or what happened there? A. Well, that he objected to the method of approach that the man was forcing himself on him, that he tried to push him away, and that the deceased attempted to force his attentions physically on him, by pushing him back down and trying to embrace him."

I note, however, that Cecil M. Franklin, Special Agent of the Federal Bureau of Investigation, interviewed Edmonds November 30, 1956, and at the trial testified as follows, without objection:

"Q. Did he tell you exactly what was done? Can you recall exactly what the defendant said to you? A. Yes.

"Q. Will you tell the ladies and gentlemen of the jury in detail just what the defendant said to you in connection with these advances. A.

The defendant stated that the individual who had picked him up commenced playing with his private parts and trying to kiss him. He objected to being kissed. As a result of that the struggle ensued."

The appellant's statement to Special Agent Franklin on November 30 was clearly admissible. That made to Dr. Cushard on December 7 added nothing to it; in fact, it was not as specific as that made to Franklin. It follows that Dr. Cushard's testimony concerning the statement was cumulative of the earlier one which was not only proper but also received without objection; consequently Dr. Cushard's testimony cannot be said to have been prejudicial to the appellant. Lampe v. United States, 1956, 97 U.S.App.D.C. 160, 229 F.2d 43.

Applicable here is the "harmless error" statute, 28 U.S.C. § 2111:

"On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."

This admonition is repeated and made specifically applicable to criminal cases in Rule 52(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

With reference to the predecessor of the present "harmless error" statute, the Supreme Court said, in Berger v. United States, 1935, 295 U.S. 78, 82, 55 S.Ct. 629, 631, 79 L.Ed. 1314:

"Evidently Congress intended by the amendment to section 269 to put an end to the too rigid application, sometimes made, of the rule that error being shown, prejudice must be presumed; and to establish the more reasonable rule that if, upon an examination of the entire record,

substantial prejudice does not appear, the error must be regarded as harmless. See Haywood v. United States, 7 Cir., 268 F. 795, 798; Rich v. United States, 8 Cir., 271 F. 566, 569, 570."

The Supreme Court has also said, "Mere 'technical errors' which do not 'affect the substantial rights of the parties' are not sufficient to set aside a jury verdict in an appellate court. 40 Stat. 1181, 28 U.S.C. § 391, 28 U.S.C.A. § 391. He who seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted." Palmer v. Hoffman, 1943, 318 U.S. 109, 116, 63 S.Ct. 477, 482, 87 L.Ed. 645.[1] This applies as well to a criminal case, unless a constitutional right is infringed. See Pulley v. United States, 8 Cir., 1958, 253 F.2d 796, and compare Davis v. United States, 8 Cir., 1956, 229 F.2d 181, 187, certiorari denied 351 U.S. 904, 76 S.Ct. 706, 100 L.Ed. 1441.

These pronouncements leave open the question when an error affects substantial rights, the answer to which must always be a matter of opinion. Mr. Justice Rutledge discussed the problem in Kotteakos v. United States, 1946, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557:

" * * * [The question is] what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, *in the total setting.* [Authorities omitted.]

"This must take account of what the error meant to them, not singled out and standing alone, *but in relation to all else that happened.* * *

"If, when all is said and done, the conviction is sure that the error did not influence the jury, *or had but very slight effect,* the verdict and

---

1. The "harmless error" provisions of the old § 391 of Title 28 U.S.C., are now contained in Rule 61, Fed.R.Civ.P., Rule 52 (a), Fed.R.Crim.P., and in 28 U.S.C. § 2111, 63 Stat. 105.

the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. * * * But if one cannot say, *with fair assurance*, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." (Emphasis supplied.)

Using this standard in the present case, I have no difficulty in concluding that the admission of the doctor's testimony as to the statement made to him by the accused, if it was error at all, was harmless error within the meaning of the statute and rule. The appellant had practically sought the homosexual advances. Accepting the invitation of a total stranger, he visited the latter's apartment at a very late hour and, when there, proceeded to remove his outer clothing and lie upon a bed. He admitted that he suspected his host of being a homosexual. In these circumstances, the testimony of Franklin, the FBI agent,[2] is particularly convincing that it was simply the method of approach which infuriated Edmonds to the point of killing, and not at all that he was defending himself against the homosexuality, which he had apparently expected. In view of the foregoing I find it impossible to believe that, except for the cumulative and more indefinite testimony of the doctor to the same effect, the jury would not have found the appellant guilty, but would have accepted his theory of self-defense against homosexual attack.

Consequently, I have a sure conviction —not just "fair assurance" which would, however, be enough—that the doctor's testimony of Edmonds' statement to him "had but slight effect" upon the verdict if it influenced the jury at all. This conviction is based, not only on the facts summarized above, but on a careful examination of the entire record, from which it is clear that substantial prejudice does not appear and that the alleged error must be regarded as harmless.

Even if that were not so, I think it plain that Dr. Cushard's testimony concerning appellant's statement to him during the examination of December 7 was properly received. The examination that day was not made pursuant to any court order, and was voluntarily submitted to by Edmonds. It was not made to determine whether the accused was competent to stand trial and therefore was not under 18 U.S.C. § 4244.[3]

Neither was it made under § 24–301, D.C.Code (1951), under which Judge McGarraghy later (December 17) ordered a 60-day period of observation and examination at St. Elizabeths which resulted in a certificate by the examining staff that Edmonds was mentally competent to stand trial.[4]

2. For convenience I quote the pertinent portion of his testimony again. Franklin said that Edmonds told him "He objected to being kissed. As a result of that the struggle ensued."

3. Section 4244 sets up a procedure for determining a question which is preliminary to, and not a part of, the trial. It has to do only with a judicial determination of the mental competency of the accused to stand trial, and provides that, upon motion, the court may order an examination to determine such competency, whether or not the accused

agrees to submit to it. Section 4244 was not changed by the amendatory legislation of August 9, 1955. It follows, as the Committee said, that its privilege continues to apply; but of course only when the section itself applies.

4. This examination was asked by Edmonds under 18 U.S.C. § 4244 but was granted by Judge McGarraghy under § 24–301, D.C.Code (1951), as amended August 9, 1955. Although we had held in Jordan v. United States, 1953, 93 U.S.App.D.C. 65, 207 F.2d 28, that § 4244 prevailed over § 301, the latter section was amend-

The examination of December 7, voluntarily participated in by Edmonds, was made at the request of the United States Attorney, who did not believe him in any way mentally incompetent to stand trial and so was under no duty to make the motion contemplated by § 4244 even if that section applied, but who anticipated the defense of insanity at the trial and wisely prepared to counteract it. This was not only proper, but was also his duty, because the Supreme Court has held that the burden of proving sanity at the time the crime was committed is upon the Government, if evidence tending to show insanity is introduced. Davis v. United States, 1895, 160 U.S. 469, 487, 16 S.Ct. 353, 40 L.Ed. 499.

Judge Bazelon's opinion recognizes that the privilege of § 4244 by its terms applies only to "any examination * * provided for by this section"; but it gets around the restriction by saying "that the statutory policy that statements made by the accused to the examining psychiatrist should not be admitted against him on the issue of guilt may not be defeated by using non-statutory procedure." This would destroy the effect of the restrictive language of § 4244 which limits the privilege to "any examination * * * provided for by this section." Such a holding would violate the rule that statutes in derogation of the common law [5] should be strictly construed. Travelers' Ins. Co. v. Bergeron, 8 Cir., 1928, 25 F.2d 680, 58 A.L.R. 1127.

The upshot of Judge Bazelon's theory is that any mental examination of an accused after arrest must be made under § 4244 or subject to its limitation as to the admissibility of any adverse statement as to the issue of guilt made by the accused during an examination thereunder. This reads too much into § 4244, and would preclude the United States Attorney from preparing to carry the burden of proving sanity.

2. I turn next to what Judge Bazelon calls "The Insanity Defense." This portion of his opinion incorrectly assumes that one of the motives behind a question may make it improper and the answer inadmissible; and it unduly limits the scope of cross-examination by erroneously saying the mental condition of his father was irrelevant to Edmonds' defense of insanity. "The Government," says the preceding opinion, "in contesting the mistrial motion, conceded that its purpose in introducing evidence relating to the father's defense was to prejudice appellant's insanity defense, but claimed a right to the advantage of such prejudice." Certainly the Government had a right to the advantage of that prejudice. The appellant's older brother had testified to behavior by Edmonds' father which might lead the jury to infer the father was of unsound mind. Such an inference would have been germane to appellant's own insanity defense, because the insanity of a parent is admissible as corroboration of other evidence tending to show insanity on the part of the child.

ed after our decision by including therein *inter alia* the following new matter:

"(h) The provisions of this section shall supersede in the District of Columbia the provisions of any Federal statutes or parts thereof inconsistent with this section."

The District Code section does not contain a provision similar to that in § 4244 that no statement made by the accused "in the course of any examination * * * provided for by this section" shall be used against him in any criminal proceeding.

[5] Neither the limited privilege of § 4244 nor the general physician-patient privilege was known to the common law. The latter was created by § 14–308, D.C.Code (1951), which, after amendment August 9, 1955, retained this significant proviso:

" * * * That this section shall not apply to evidence in criminal cases where the accused is charged with causing the death of, or inflicting injuries upon a human being, and the disclosure shall be required in the interests of public justice * * *."

Thus Congress provided that the privilege of § 14–308 should not protect one charged with violence against the person.

United States v. Holmes, C.C.D.Me.1858, 26 Fed.Cas. p. 349, No. 15,382; Guiteau's Case, D.C.1882, 10 F. 161; cf. Coughlin v. Poulson, D.C.1875, 2 MacArthur 308; Howells State Bank v. Novotny, 8 Cir., 1934, 69 F.2d 32, 35. This rule is well established by many decisions of state courts, typical of which are the following: People v. Garbutt, 1868, 17 Mich. 9, 97 Am.Dec. 162; Wheeler v. State, 1878, 34 Ohio St. 394, 32 Am.Rep. 372; Wright v. Commonwealth, 1903, 24 Ky. Law Rep. 1838, 72 S.W. 340; Watts v. State, 1904, 99 Md. 30, 57 A. 542; Commonwealth v. Johnson, 1905, 188 Mass. 382, 74 N.E. 939; Dillman v. McDanel, 1906, 222 Ill. 276, 78 N.E. 591; People v. Kohlmeyer, 1940, 284 N.Y. 366, 31 N.E.2d 490; Watson v. State, 1954, 161 Tex.Cr.R. 5, 273 S.W.2d 879.

In these circumstances it was the right and duty of the prosecutor to dispel such an inference by eliciting through cross-examination the fact that the jury had rejected the father's defense of insanity. On cross-examination, a witness "cannot be compelled to testify as to facts not relevant to direct examination, but he can be required to supply the full details of matters within the scope of the direct examination but stated there only in part." Branch v. United States, 1948, 84 U.S.App.D.C. 165, 171 F.2d 337, 338. It is proper for the cross-examiner to bring out anything tending to contradict, modify or explain the testimony on direct or any inference that may be drawn therefrom. Washington Ry. & Elec. Co. v. Dittman, 1915, 44 App.D.C. 89; Mintz v. Premier Cab Ass'n, 1942, 75 U.S.App.D.C. 389, 127 F.2d 744.

---

The appellant coolly told the whole story about how he had choked his victim to death; how, afterward, he searched for and found the keys to the victim's car; how he helped himself to the victim's money and radio before he left the scene of the killing. He also told that, in opening the door to leave the victim's apartment, and also in closing it from the outside, he used his coat to prevent leaving fingerprints on the knob. This was a most significant admission: it showed the appellant was conscious of guilt—that he knew what he had done was wrong.

Edmonds was properly convicted, and there is no reason to disturb the jury's verdict. I would affirm the judgment.