Rudolph N. THORNTON, Petitioner,

v.

Honorable Howard F. CORCORAN, Respondent.

No. 21974.

United States Court of Appeals
District of Columbia Circuit.

Decided Jan. 3, 1969.

---

Mr. Allan M. Palmer, Washington, D. C., for the petitioner.

Mr. Roger E. Zuckerman, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the opposition to the petition.

Mr. Sidney Edelman, New York City, filed a brief on behalf of Saint Elizabeths, as amicus curiae.

Mr. William H. Allen, Washington, D. C., filed a brief, as amicus curiae. Mr. William A. Dobrovir, Washington, D. C., was also on the brief, as amicus curiae.

Before BAZELON, Chief Judge, and BURGER and ROBINSON, Circuit Judges.

BAZELON, Chief Judge:

After the Court of General Sessions bound the petitioner over to the grand jury for action on a complaint charging him with the rape of an 11-year-old girl, Rudolph N. Thornton requested a pre-indictment mental examination under 24 D.C.Code § 301(a) (1967). The District Court ordered him committed for 60 days to Saint Elizabeths Hospital for an examination to determine not only his competency to stand trial but also whether Thornton was suffering from a mental illness at the time of the alleged offense. During that period he requested the district judge to order the hospital to permit his counsel and an independent psychiatrist to attend the staff conference that would be held before the hospital filed its report with the District Court. His motion was denied without explanation. Thornton then petitioned this Court for a writ of mandamus directing the district judge to issue such an order. Since it appeared to the Court "that further consideration of petitioner's mandamus petition will be required," we entered an interim order on July 9 directing that

Saint Elizabeths Hospital hold its staff conference concerning petitioner without awaiting the disposition of his petition, and that the Hospital record the conference on audio tape, such recording to be sealed and kept in the sole

custody of the Hospital until further order of this Court.

Subsequent auxiliary orders were entered on July 9, September 20 and October 17 that are not here relevant.

## I

We begin with the realization that the peremptory common-law writs such as mandamus, prohibition and injunction are, when directed against judges, "extraordinary remedies * * reserved for really extraordinary causes." Ex parte Fahey, 332 U.S. 258, 260, 67 S.Ct. 1558, 1559, 91 L.Ed. 2041 (1947). The traditional function for mandamus has been "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943). The sharp restrictions thus placed upon mandamus arise partly because such writs "have the unfortunate consequence of making the judge a litigant, obliged to obtain personal counsel or to leave his defense to one of the litigants before him." Ex parte Fahey, 332 U.S. at 260, 67 S.Ct. at 1559. More importantly, mandamus when sought during or before trial runs counter to the requirement of "finality [that] as a condition of review is an historic characteristic of federal appellate procedure," Cobbledick v. United States, 309 U.S. 323, 324, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940).

In its most recent encounter with mandamus in the context of a criminal trial, a unanimous Supreme Court vacated a writ issued by the Seventh Circuit Court of Appeals in an opinion richly larded with citations limiting the use of mandamus. Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967). In doing so the Court carefully narrowed the language it had employed to support a writ of mandamus in the civil case of Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964):

The Court there did note that the various questions concerning the construction of Rule 35 [of the Federal Rules of Civil Procedure] were new and substantial, but it rested the existence of mandamus jurisdiction squarely on the fact that there was real doubt whether the District Court had any power at all to order a defendant to submit to a physical examination. 389 U.S. at 104, 88 S.Ct. at 278 n. 14.

The *Will* decision may be distinguishable from the present proceeding in that the Government was there the party seeking a writ of mandamus. In that context the "general policy against piecemeal appeals" was strengthened by "an awareness of the constitutional precepts that a man is entitled to a speedy trial and that he may not be placed twice in jeopardy for the same offense." *Id.* at 98, 88 S.Ct. at 275. Nevertheless, the flavor of the Chief Justice's opinion in *Will* must chill the enthusiasm of any intermediate court to issue such an extraordinary writ in any criminal case.

Which is not to say that a writ of mandamus may never issue in a criminal case. As the Supreme Court itself pointed out in *Will*, "It has been invoked successfully where the action of the trial court totally deprived the Government of its right to initiate a prosecution, Ex parte United States, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932), and where the court overreached its judicial power to deny the Government the rightful fruits of a valid conviction, Ex parte United States, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916)." And this Court has issued such writs to compel trial judges to heed our interpretations of the Federal Rules of Criminal Procedure. *See* Ross v. Sirica, 127 U.S.App.D.C. 10, 380 F.2d 557 (1967); *cf.* Blue v. United States, 119 U.S.App.D.C. 315, 321, 342 F.2d 894, 900 (1964), cert. denied 380 U.S. 944, 85 S.Ct. 1029, 13 L.Ed.2d 964 (1965); Jones v. Gasch, 131 U.S.App. D.C. 254, 265, 404 F.2d 1231, 1242 (1968).

The petitioner here does not claim that the District Court has ex-

ceeded its power, but rather that it has failed "to exercise its authority when it is its duty to do so." A party seeking mandamus has, in the oft-repeated phrase, "the burden of showing that its right to issuance of the writ is 'clear and indisputable.' " Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 384, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953). This test, while expressive of the general appellate reluctance to issue such writs, is not a uniformly useful guide. Where the trial court is entrusted with substantial discretion, error may reside along a continuum and the appellate court can meaningfully speak of a "*clear* showing of abuse." Jones v. Gasch, 131 U.S.App. D.C. 254, 265, 404 F.2d 1231, 1242 (1968) (emphasis added). In other circumstances, however, the duty of the trial judge to exercise his authority cannot be rendered unreviewable "under the guise of judicial discretion." Ex parte United States, 287 U.S. 241, 250, 53 S.Ct. 129, 132 (1932). In such situations the trial court has erred or it has not, and the clearness *vel non* of its error may be more a catchword than an actual litmus paper. Thus, when the petitioner invokes the power of the appellate court to protect an asserted constitutional right, the right exists and merits protection or it does not. An examination of the merits of his claim is required in order to decide which is the case. But once that exercise has been completed, the appellate court can hardly assess in retrospect whether the right was "clear and indisputable" all the time.

■ On the other hand, however, even a constitutional claim may depend upon a factual situation the implications of which can not readily be assessed without the benefit of a full trial record. In vacating the writ issued in *Will*, the Supreme Court relied ultimately upon "the failure of the Court of Appeals to attempt to supply any reasoned justification of its action." 389 U.S. at 104, 88 S.Ct. at 278. To determine the propriety of a writ of mandamus, therefore, we must scrutinize the petitioner's claims in light of the requirement set by the Supreme Court for "findings of fact by the issuing court and some statement of the court's legal reasoning." *Id.* at 107, 88 S.Ct. at 280. To the extent that the inchoate record in this case precludes the requisite findings of fact, mandamus is an inappropriate remedy.

## II

The petitioner argues that the logic of Wade v. United States, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), compels recognition of his right to counsel during his staff conference at Saint Elizabeths. The Supreme Court concluded there, in holding that the accused is entitled to a lawyer at his lineup, that "the plain wording of [the Sixth Amendment] * * * encompasses counsel's assistance whenever necessary to assure a meaningful 'defence,' " *id.* at 225, 87 S.Ct. at 1931, and went on to elaborate,

[T]he accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial. * * * In sum, the principle of Powell v. Alabama and succeeding cases requires that we scrutinize *any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself.

*Id.* at 226–227, 87 S.Ct. at 1932 (footnote omitted).

At the same time, the Court pointed out in *Wade* that its sweeping words did not apply to all "preparatory steps" before trial. It specifically distinguished the taking of fingerprints or a blood sample on the grounds that "knowledge of the techniques and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes

of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts." *Id.* at 227–228, 87 S.Ct. at 1932; *see also* Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

It might be argued that a psychiatric examination resembles such a scientific test more closely than a lineup. In addition, such examinations might also be distinguished from lineups on other grounds. Thus, the examination at Saint Elizabeths is not prosecutorial in nature; the doctors are required to be impartial in their evaluation of the accused. Because of this, there is neither the same reason to suspect the sort of abuses which troubled the Court in *Wade, see* 388 U.S. at 228–239, 87 S.Ct. 1926, nor evidence that such abuses have occurred. Moreover, the majority of pretrial examinations are, like the one in this case, requested by the defense; unlike a lineup, there is no literal compulsion involved in these circumstances.

Unfortunately, the argument that mental examinations should be assimilated to scientific tests for Sixth Amendment purposes finds scant support in the experience of this jurisdiction in administering the insanity defense. Unlike the realm of fingerprints and blood samples, there is at best small agreement among experts concerning either the theory or technique appropriate to the diagnosis of mental illness. The "variable factors" are legion.

While it is true that the examining doctors at Saint Elizabeths are in theory impartial, moreover, as a practical matter some or all of those involved normally testify for the Government when the insanity defense is raised at trial. In this case counsel for the petitioner concede that the evidence is strong that he committed the acts charged, and aver that the principal issue at trial, assuming Thornton is found competent, will be that of responsibility. If this is true, there can be little doubt that his staff confer-

ence at Saint Elizabeths will represent an important confrontation with experts likely to testify for the Government. Moreover, just as the Supreme Court argued in *Wade* that a witness once having identified a suspect in a lineup is unlikely to retract the identification at trial, our experience suggests that the representatives of Saint Elizabeths rarely contradict in their testimony at trial an opinion they have voiced at the staff conference. Finally, the fact that many defendants wishing to assert the insanity defense are indigents who, as a practical matter, must rely upon an examination under 24 D.C.Code § 301(a) (1967) to raise their defense calls into question the confidence with which we can conclude that requests for such examinations are truly "voluntary."

### III

It is thus anything but clear what guidance we should draw from *Wade* in this context. The task is complicated by the further factor that we cannot assume that the staff conference can be treated as a single whole in defining the petitioner's right to the assistance of counsel. The amicus curiae brief submitted by the hospital in this case and the other information available to this Court [1] indicate that the typical staff conference includes both an interview with the individual committed for examination and deliberations by the attending staff members at which the individual is not present. The petitioner does not distinguish between these discreet parts of the conference in demanding that his counsel or an independent psychiatrist be allowed to attend, but the issues involved may be quite different.

Insofar as the petitioner's appearance before the staff conference is concerned, the Sixth Amendment claim can not be resolved without reference to the privilege against self-incrimination. The Supreme Court disposed of that issue in

---

1. *See* JUDICIAL CONFERENCE OF THE DISTRICT OF COLUMBIA, REPORT OF THE COMM. ON PROBLEMS CONNECTED WITH MENTAL EXAMINATION OF THE ACCUSED IN CRIMINAL CASES, BEFORE TRIAL 31–33 (1966) [hereinafter JUDICIAL CONFERENCE REPORT].

*Wade* on the ground that no "evidence of a testimonial or communicative nature" was extracted by a lineup. 388 U.S. at 221–223, 87 S.Ct. at 1929; *see also* Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826 (1966). This argument can hardly do service in the context of a psychiatric examination, however, where the words of the accused are critically important in determining his mental condition. The few cases that have considered this issue have rejected the claim, but their reasoning has been less than satisfying. The Fourth Circuit, for example, reasoning from the premise that the Government in all federal cases bears the burden of proving the sanity of the accused beyond a reasonable doubt once the issue has been properly raised, Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), has concluded that "if the government is required 'to shoulder the entire load,' it cannot be denied access to the only reliable means of ascertaining the truth concerning a defendant's sanity." United States v. Albright, 388 F.2d 719, 724 (4th Cir. 1968); *see also* Alexander v. United States, 380 F.2d 33, 39 (8th Cir. 1967); Pope v. United States, 372 F.2d 710, 720–721 (8th Cir. 1967), vacated on other grounds 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). But this argument from necessity, however compelling, no longer justifies interrogation of the defendant without regard for the Fifth Amendment concerning his participation in the acts charged, where the Government of course must also "shoul-

der the entire load." Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There may be sound reasons to distinguish between criminal acts and the accompanying mental state of the actor in measuring the scope of the self-incrimination privilege. But since the Government must prove both a "vicious act" and a "vicious will," we cannot simply assume a distinction between the two insofar as the privilege against self-incrimination is concerned.[2]

It has also been suggested that the defendant waives whatever self-incrimination privilege he might otherwise enjoy when he requests the Government to provide a mental examination.[3] This argument has force insofar as a psychiatric examination is involved. But the petitioner here raises no question concerning the general procedures followed during the period of his temporary commitment to Saint Elizabeths Hospital for examination. His claim relates only to the staff conference to be held before the hospital submits its report to the District Court, which represents a much more formal confrontation. One report dealing with procedures followed at Saint Elizabeths, with which the amicus curiae brief of the hospital is in accord, states that

> The staff conference is attended by the following personnel with the indicated frequency: senior staff psychiatrist (always); staff physicians (often); psychologist (always); social worker (often); psychiatric residents in training (often).[4]

2. For the recommendations and reasoning of one advisory group that has confronted the difficult conceptual problem of reconciling psychiatric interviews with the criminal defendant with the broad tenets of the self-incrimination privilege, see JUDICIAL CONFERENCE REPORT 55–56, 107–118. The statute governing pretrial examinations in federal courts, including the District of Columbia, see Edmonds v. United States, 104 U.S.App.D. C. 144, 260 F.2d 474 (1958), provides that "no statement made by the accused in the course of any examination * * * shall be admitted in evidence against the accused on the issue of guilt in any crim-

inal proceeding." 18 U.S.C. § 4244 (1964). The context and history indicates that "issue of guilt" meant to the legislative "issue of guilt other than an issue of guilt by reason of insanity." Nothing in the background or application of the statute, however, suggests any reason but long practice to except statements relating to sanity from the protection of the Fifth Amendment.

3. *See* JUDICIAL CONFERENCE REPORT 116– 117.

4. *Id.* at 32.

While a defendant may agree to speak freely to an examining doctor when he requests an examination, it is not immediately clear that he consents to a similar waiver of his privilege against self-incrimination before the staff conference. Sound medical practice may make the culminating staff conference inseparable from the underlying examinations and interviews by a single doctor.[5] But without a showing of such a compelling nexus between the two, we are reluctant to conclude that a waiver of the self-incrimination privilege regarding one must entail a corresponding waiver concerning the other.[6]

To the extent that the self-incrimination issue arises when the individual is interviewed by the assembled battery of experts at his staff conference, the argument for a right to counsel during at least that part of the conference becomes more compelling. The standard justification for excluding counsel from the examining room is that because of "the intimate and personal nature of the examination * * *, the presence of a third party, in a legal and non-medical capacity, would severely impair the efficacy of the examination." United States v. Albright, 388 F.2d at 726. This reasoning also loses much of its force when a staff conference is involved. A lawyer is undeniably a "third party" to the doctor-patient relationship. As such, physicians may feel he is a fatally disruptive influence. But the staff conference is hardly as private and as in-dividualized an encounter. The individual under examination faces a number of staff members, most of whom he has never seen before. The argument that a lawyer will prove a fatally disruptive influence at such a hearing is not compelling.[7]

## IV

A considerably different problem is posed by that part of the staff conference which the defendant does not attend. At that stage no issue of self-incrimination can arise, and there is no direct confrontation between the accused and potential Government witnesses. But these considerations do not sap the petitioner's claim that his counsel should be allowed to attend of all strength. The ability of defense counsel to cross-examine Government witnesses is crucially important not only on the issue of competency to stand trial but also when the insanity defense is raised at trial, as this Court has often pointed out. See Henderson v. United States, 123 U.S. App.D.C. 380, 385, 360 F.2d 514, 518–519 (1966) (concurring opinion); Rollerson v. United States, 119 U.S.App. D.C. 400, 406, 343 F.2d 269, 274–275 (1964); Jackson v. United States, 118 U.S.App.D.C. 341, 346, 336 F.2d 579, 584 (1964).

Saint Elizabeths Hospital has argued in its amicus curiae brief that the defense attorney can adequately cross-examine its staff members who may testify for the Government on the basis of the

5. "The staff conference is * * * the culminating event in the accused's examination." *Id.*

6. Saint Elizabeths Hospital devotes several pages of its brief to a description of "The Medical Staff Conference as an Integral Part of the Medical Examination," in the course of which it carefully points out, however, that the decision to hold a conference made "in the discretion of the Clinical Director." In a later report to the District Court, the hospital has re-emphasized the discretionary nature of the staff conference, pointing out that approximately 270 of some 570 reports to the courts of the District of Columbia since January 1, 1968,

concerning persons committed under 24 D.C.Code § 301 (1967) have been made without a staff conference. These statistics might suggest that a staff conference is not such an inevitable corollary of a pretrial examination as to require a rule that a waiver of the self-incrimination regarding the latter must encompass a waiver regarding the former as well.

7. We note, also, as the Supreme Court observed in *Wade* that "to refuse to recognize the right to counsel for fear that counsel will obstruct the course of justice is contrary to the basic assumptions upon which this Court has operated in Sixth Amendment cases." 388 U.S. at 237–238, 87 S.Ct. at 1938.

reports and files it will make available to counsel. However, the hospital has not displayed an enthusiasm to make such reports available to the defense. As recently as last year it refused to allow a defense psychiatrist access to the reports of its staff psychologist. *See* Washington v. United States, 129 U.S.App.D.C. 29, 32, 390 F.2d 444, 447 (1967). And whether the failure is due to the inability of defense attorneys to obtain or to interpret hospital files, our experience has made it all too clear that trial counsel are frequently unable to cross-examine government witnesses with sophistication. The problem, moreover, is hardly unique to this jurisdiction.[8] Ideally, there should be a specialized, experienced bar skilled in legal problems revolving about mental illness. There is not, however, and realistically there probably never will be such a legal corps. The lawyer appointed to represent an indigent defendant who may be incompetent to stand trial or who may have been mentally ill at the time of his alleged offense may have had little if any exposure to such problems. His skills as a lawyer may enable him to educate himself concerning the legal issues at stake. But even the most determined appointed attorney will have difficulty learning even a sufficient smattering of psychiatry to intelligently cross-examine Government witnesses, let alone prepare his defense. Much greater attention must undoubtedly be devoted to the discovery of devices whereby this lack of sophistication on the part of the bar can be combatted. An obvious starting point in the search is the hospital where the defendant receives a psychiatric examination. Certainly the lawyer struggling to inform himself not only about the mental condition of his client but also about the abstrusities of forensic psychiatry is entitled to expect the fullest cooperation from the hospital. If he does not receive any, he may fairly ask the court to exercise its authority to compel the cooperation of the hospital.

## V

The petitioner's claim that the logic of Wade v. United States should apply to his staff conference at Saint Elizabeths Hospital is therefore anything but frivolous. If his right to cross-examine the witnesses against him can be protected in no other way, his argument is of constitutional dimensions. Moreover, our responsibility for the administration of the insanity defense in the District of Columbia may require the exercise of our supervisory power. But the complexity of the issues involved and the uncertain factual matrix within which they must be resolved persuades us that a solution should not be attempted in the context of this petition for a writ of mandamus.

■ Even could we conclude the petitioner is constitutionally entitled to further protection of his rights at the staff conference, we cannot be certain that the presence of counsel is the appropriate remedy. It may be that alternative devices such as recording some or all parts of the staff conference may satisfy the Constitution at less cost to the effectiveness of the staff conference. The broad range of the alternatives to be considered can better be evaluated with the aid of a full factual record in a post-trial proceeding. Saint Elizabeths Hospital argues in the amicus curiae brief submitted at the Court's invitation that the hospital records and reports available to the defense already enable the attorney to adequately cross-examine the Government witnesses from the hospital. Thus, the hospital brief assures us that not only can the defense obtain copies of the medical staff conference report, but also the lawyer for the accused can examine all the material in the hospital records considered at the staff conference and discuss the case informally with all hospital personnel whose observations are included in the patient's file. The full record available to this Court after trial will enable us to better judge both the adequacy of these alterna-

8. *See generally*, A. GOLDSTEIN, THE INSANITY DEFENSE 122–140 (1967).

tive sources of information and how, if such material as presently made available is not adequate, our responsibility to protect the constitutional rights of the accused and promote the efficient administration of justice can best be carried out.

In so concluding we well recognize the powerful argument in favor of resolving this petitioner's claims today. The alleged offense was committed in March 1968. The insanity defense revolves, of course, upon whether he was then mentally ill and if so whether the criminal acts if committed were the product of that illness. If he is convicted and succeeds in an eventual appeal challenging his examination at Saint Elizabeths Hospital, his victory may prove pyrrhic. At that future date a fresh examination directed toward his mental health last March will be sorely tardy. But the Supreme Court has often stated that hardship in individual cases is not an appropriate ground for mandamus. *See, e. g.*, Schlagenhauf v. Holder, 379 U.S. 104, 110, 85 S.Ct. 234 (1964). The policy against the issuance of such extraordinary writs as mandamus roots in broad considerations of judicial administration and must prevail against the seeming logic of prompt relief in the individual case.

The Orders of this Court previously issued in this case to avoid delay of the appellant's examination and trial during our consideration of the petition for a writ of mandamus are vacated insofar as they might require any future action by the participants, since we have concluded that mandamus does not offer an appropriate remedy.[9] Our disposition does not, of course, preclude the trial judge from reconsidering the original motion of the petitioner Rudolph N. Thornton in light of the illumination cast by this opinion. Since the issues discussed in this opinion may well play a part in any subsequent appeal if the petitioner is found competent to stand trial and·convicted, we assume the hospital will not destroy the tape recordings it has made of the staff conference recently conducted.

So ordered.

BURGER, Circuit Judge (concurring in vacating of all orders and dissenting as to all else):

Since the Court now vacates the orders to which my dissent of November 18, 1968 was addressed, no more need be said as to the unavailability of mandamus in this case nor as to the propriety of commanding the Superintendent

---

**9.** It would normally not require mention that our rejection today of the petition for a writ of mandamus does not retrospectively affect the vitality of these orders during the period for which they were entered—*i.e.*, the time necessary to reach a decision on the underlying petition. The failure of the dissent to distinguish between a decision on the petition for mandamus and an order pending that decision, however, demands that the Court clearly state that while the orders entered in this case are terminated as to any future operation by our decision today, they are not declared void as to their past operation. The alarm voiced by the dissent concerning the power of this Court to enter an order pending a decision in a case of this sort we find puzzling. While 24 D.C.Code § 301(b) (1967) rests certain responsibilities in the superintendent of a hospital to which an accused has been committed for a competency examination, the statute nowhere

mentions anything concerning the exclusivity of this power or responsibility. We can see no reason why courts cannot protect the constitutional rights of a criminal defendant from violation by doctors as well as by policemen and prosecutors. Certainly no one has ever suggested that 4 D.C.Code § 119 (1967), which assigns to the Police Board of Commissioners the duty "to preserve the public peace" and "to prevent crime," renders this Court jurisdictionally impotent to examine the constitutionality of police conduct.

As for the temporary orders which directed the trial judge in this case to make certain that a staff conference was held, it should be all but superfluous to point out, as we did in our order of September 20, that these steps were made necessary only by the failure of the authorities at Saint Elizabeths Hospital to do what they had assured this Court they would do—*i.e.*, hold a staff conference.

of St. Elizabeths Hospital by any judicial process as to how he should reach his medical diagnostic conclusions. My concurrence in the result reached today is of course predicated upon my previously expressed view that the orders now vacated should not have been entered in the first instance. I have placed in an appendix to this opinion the prior orders which are now vacated.

The majority statement, even though totally dicta, expresses views as to significant legal problems which I cannot join. As with the previous actions in this case my disagreement is one of a threshold nature. I cannot perceive any valid legal predicate upon which the majority can now rely. Not the least of the deficiencies is the fact that there is no longer a "case or controversy" before this Court. Indeed, both in tenor and substance the majority's discussion is purely advisory and hortatory. It does not resolve but merely purports to cast "illumination" on the issues; St. Elizabeths is advised only of the Court's "assumption" that it will preserve the tape recordings; neither of the parties is being ordered to do or refrain from doing anything. As I have noted elsewhere, St. Elizabeths' dutiful compliance with the Court's prior orders, of which the majority seems cognizant, moots whatever issues might otherwise have existed. So far as any judicial power is concerned, St. Elizabeths Hospital is free to do what it wishes with its tape recordings.

Regardless of the "jurisdictional" vestiges which might be thought to have survived the "interim" orders, today's expressions of the majority demonstrate the infirmities of entering stop-gap orders without legal foundation. There was no emergency on October 17, 1968 which required immediate action; there was no claim or likelihood of irreparable injury; in fact, the traditional prerequisites warranting accelerated judicial

action and extraordinary relief have been conspicuously absent throughout this litigation.[1] The Superintendent of St. Elizabeths Hospital is in a curiously ambiguous posture. Having complied with hasty and unwarranted judicial action which had the color of validity, the Superintendent is now in effect being thanked for his compliance and forbearance, and informed of this Court's after-the-fact perplexity with the underlying legal issues.

The "puzzlement" expressed by the majority in its Note 9 is self inflicted and can be readily dispelled by reference to the facts of the case.

It is correct that ordinarily rejection of mandamus does not retrospectively affect interlocutory mandates, but when the interim orders are vacated by the same judges who entered them because they now recognize that mandamus is neither available nor appropriate, then I submit that the nullity of those interim orders is firmly established. To argue, as the majority does, that vacating the orders does not affect their original validity is no more than acknowledging the human impossibility of "unringing the bell."

The methodology of the extraordinary course of judicial action in this case— and now retracted by the majority— should be noted since it could well help us avoid such a situation in the future. Without any decision on the merits, the majority entered a series of ill-advised orders on assumptions now acknowledged to have been without validity. Especially significant is the fact that three of the five orders operated on someone never made a party to the proceeding. Moreover, it can hardly be thought that the interim orders directed against St. Elizabeths Hospital were intended to preserve the status quo because by ordering an affirmative act they *changed* that status; three of the orders cannot

---

1. Assuming *arguendo* that the Court did have jurisdiction, it is clear that no emergency situation existed requiring a hasty judicial response; the interim order entered September 20, 1968 was in response to a supplemental memorandum filed August 20, 1968 which contained no hint of an emergency.

be justified as intended to preserve jurisdiction because there could be no mandamus jurisdiction of a non-party.

Unlike the majority, I think it inappropriate at this time to engage in an extended discussion of the Fifth and Sixth Amendments and their applicability to psychiatric examinations; no issues and no case are before us. Although this point was raised in the original pleadings, the disposition of this case renders it unnecessary to reach or decide those questions. The majority's present discussion seems all the more unnecessary in view of its expressed aversion to decide admittedly novel and important legal issues in the face of a virtually barren factual matrix and without the benefit of any briefing or argument; consequently, such discussion is plainly dicta and in no sense authoritative. To the extent of the intimations that the Fifth Amendment may require the presence of counsel at pretrial psychiatric examinations and Staff Conferences I must vigorously disagree. Moreover, I see no theoretical or practical justification apart from the Fifth Amendment for permitting counsel to attend these pretrial encounters.[2] My previously expressed views on these matters suffice for present purposes, and I will attach them in the appendix to this statement.

## APPENDIX

### United States Court of Appeals
### For the District of Columbia Circuit

No. 21,974.                                   **September Term, 1967**

Rudolph N. Thornton,                          Grand Jury #859–68

*Petitioner*

v.                                            [Filed July 9, 1968]

Honorable Howard F. Corcoran,

*Respondent.*

Before: BAZELON, Chief Judge, BURGER and ROBINSON, Circuit Judges, in Chambers.

### ORDER

PER CURIAM.

It appearing to the Court that further consideration of petitioner's mandamus petition will be required, and that petitioner has already been committed to Saint Elizabeths Hospital for over sixty days, it is

Ordered by the Court, *sua sponte*, that Saint Elizabeths Hospital hold its staff conference concerning petitioner without awaiting the disposition of his petitioner, and that the Hospital record the conference on audio tape, such recording to be sealed and kept in the sole custody of the Hospital until further order of this Court.

Circuit Judge BURGER did not participate in the foregoing order.

2. *See* p. 711, *infra*, dissent to order filed October 17, 1968 (Appendix).

United States Court of Appeals
for the District of Columbia Circuit

No. 21,974                                  September Term, 1967

                                       Grand Jury No. 859–68
Rudolph N. Thornton,
                     Petitioner,
          v.                                [Filed July 9, 1968]

Honorable Howard F. Corcoran,
                     Respondent.

Before: BAZELON, Chief Judge; BURGER and ROBINSON, Circuit Judges, in Chambers.

ORDER

PER CURIAM.

It appearing to the Court that petitioner has requested relief which may affect certain procedures at Saint Elizabeths Hospital, the Court, *sua sponte*, invites the hospital to submit, as *amicus curiae*, on or before July 18, 1968, a brief setting forth its views on the desirability and feasibility of (1) permitting defense counsel and independent psychiatrists to be present at staff conferences which determine the Hospital's recommendations concerning competence to stand trial and mental condition at the time of the alleged offense; (2) permitting transcription, by audio or video tape, of staff conferences for use by defense counsel and independent psychiatrists not present at such conferences; and (3) establishing any other procedures for assuring that defense counsel are able to effectively cross-examine Hospital personnel at trial concerning their participation in the staff conferences.

The Court, *sua sponte*, also invites William H. Allen, Esquire, Chairman of the Committee to Seek Legislation as a Result of the Findings of the Standing Committee on "Problems Connected with Mental Examination of the Accused in Criminal Cases Before Trial" to submit, as *amicus curiae*, on or before July 22, 1968, a brief setting forth his views on the above matters. The requirement that the aforesaid briefs be printed is waived.

Circuit Judge BURGER did not participate in the foregoing order.

United States Court of Appeals
for the District of Columbia Circuit

No. 21,974                                  September Term, 1967

Rudolph N. Thornton,                        Grand Jury Term 859–68
                     Petitioner,
          v.                                [Filed July 26, 1968]

Honorable Howard F. Corcoran,
Judge of the United States District
Court for the District of Columbia,
                     Respondent.

Before: BAZELON, Chief Judge, BURGER and ROBINSON, Circuit Judges, in Chambers.

## ORDER

PER CURIAM.

On consideration of the motion on behalf of St. Elizabeths Hospital for relief from the requirements of the order of this Court of July 9, 1968, and for permission to return appellant to his pre-trial status and of petitioner's opposition thereto, it is

Ordered by the Court that the aforesaid motion on behalf of St. Elizabeth's Hospital is denied, and it is

Further ordered by the Court that St. Elizabeth's Hospital shall comply forthwith with this Court's order of July 9, 1968.

Circuit Judge BURGER desires to record his understanding that this order is not intended and is not to be construed as implying any requirement that a staff conference be held by the staff of Saint Elizabeths Hospital, but only that, when and if a conference is held, it is to be recorded subject to further order of the Court as to what use, if any, may be made of such recordings.

United States Court of Appeals
for the District of Columbia Circuit

No. 21,974          September Term, 1968

Rudolph N. Thornton,        (Grand Jury No. 859–68)
          Petitioner,       (Criminal No. 884–68)
       v.                 [Filed Sept. 30, 1968]

Honorable Howard F. Corcoran,
          Respondent.

Before BAZELON, Chief Judge, BURGER and ROBINSON, Circuit Judges, in Chambers.

## MEMORANDUM ORDER

PER CURIAM.

Following his indictment for rape, Rudolph N. Thornton was committed to Saint Elizabeths Hospital for a mental examination. During the period of that 60-day commitment, he petitioned this Court in May 1968 for a writ of mandamus directing the district judge in his case to issue an order permitting his counsel and an independent psychiatrist to attend the staff conference that would be held before the hospital filed its report with the District Court. The respondent opposed the petition, reporting to this Court that the "staff conference has been postponed until resolution of petitioner's present challenge."

Since we concluded that "further consideration of petitioner's mandamus petition will be required," and since we did not wish to unnecessarily delay the examination process, this Court entered an order on July 9 directing that

Saint Elizabeths Hospital hold its staff conference concerning petitioner without awaiting the disposition of his petition, and that the Hospital record the conference on audio tape to be sealed and kept in the sole custody of the Hospital until further order of this Court.

In a separate order the same day we invited the hospital to submit an amicus curiae brief stating its views on the desirability of establishing procedures to assure the ability of defense counsel to adequately cross-examine hospital personnel at trial, either by permitting the attendance of counsel at staff conferences, by transcribing staff conferences, or by other devices.

The Hospital then filed a motion requesting elimination of the requirements of the July 9 order "direct[ing] the Hospital to conduct a staff conference concerning appellant and to record such conference on audio tape." The Hospital argued that in view of "the importance of the action requested by [Thornton] as far as the operation and management of Saint Elizabeths is concerned, the hospital seeks * * * to defer conducting any staff conference until a final decision is reached. * * *"

A week later the hospital submitted its amicus curiae brief, which stated in reference to its motion for relief that "the court is assured that if said motion is denied, a conference, in full compliance with the July 9 order of this court, will be held prior to the expiration of the period of petitioner's authorized commitment to the hospital."

This Court denied the Hospital's motion on July 26. Subsequently, the Hospital, without holding a staff conference, certified to the District Court that Mr. Thornton was competent to stand trial. In view of the Hospital's previous representations and the language of the order of July 9, we had thought it plain that a staff conference was to be held, and preserved on tape pending our final disposition of the petition for mandamus.

It now appears that Mr. Thornton has been returned to the District Court, found competent to stand trial, and released on recognizance pending trial. Since the staff conference contemplated by our order of July 9 has not been held, we at this time enlist the assistance of the district judge to take whatever steps are necessary to rectify whatever misunderstanding occurred. Since Saint Elizabeths Hospital advised this court at the time of its request that the staff conference be postponed until a final decision had been reached on the petition for mandamus that "postponement of the staff conference would not affect the verity of the conclusions to be reached," we are confident that the situation can be promptly and adequately rectified.

It is so ordered.

Circuit Judge BURGER did not participate in the foregoing order.

United States Court of Appeals
for the District of Columbia Circuit

No. 21,974                                        September Term, 1968

Rudolph N. Thornton,                                    Grand Jury 859–68
                        Petitioner,                     (Criminal 884–68)
            v.                                          [Filed Oct. 17, 1968]

Honorable Howard F. Corcoran,
                        Respondent.

Before: BAZELON, Chief Judge, and BURGER and ROBINSON, Circuit Judges, in Chambers.

ORDER

PER CURIAM.

In the above-entitled case, this Court on September 20, 1968, filed a memorandum order designed to avoid delay, while the petition for writ of mandamus was pending decision in the proceedings in petitioner's criminal case. As the memorandum order stated, this Court was "confident that the situation can be promptly and adequately rectified" in the District Court. This Court having now been informed that further steps have not been promptly taken to rectify the misunderstanding which has occurred, resulting in a failure to hold the staff conference which Saint Elizabeths Hospital assured this Court would be held if its motion for relief from the July 9, 1968, order of this Court were denied, it is

Ordered by the Court, *sua sponte*, in the interest of expediting the proceedings, that the aforesaid memorandum order of September 20, 1968, be modified to direct the District Court (1) to proceed forthwith and without any further delay whatsoever to cause the petitioner to be placed in the same position he was in prior to the certification by the hospital authorities to the District Court that he was competent to stand trial, and (2) to direct that the hospital proceed forthwith in accordance with the representation contained in its amicus curiae brief, which this Court relied upon, to accord to petitioner a staff conference, with the incidents directed in this Court's order of July 9, 1968. This order does not contemplate the further commitment of petitioner to Saint Elizabeths Hospital except for whatever minimum period is required to conduct the staff conference.

The Clerk of this Court shall issue forthwith a certified copy of this order to the District Court.

Circuit Judge BURGER did not participate in the foregoing order.

United States Court of Appeals
for the District of Columbia Circuit

No. 21,974                                    **September Term, 1968**

Rudolph N. Thornton,
                    Petitioner
            v.                                [Filed Nov. 18, 1968]

Honorable Howard F. Corcoran,
                    Respondent

BURGER, Circuit Judge, dissenting:

I dissent from the foregoing order (which was entered during my absence and without notice to me). I dissent because this court is totally without lawful power or authority to order or direct St. Elizabeths Hospital on the matter of holding or not holding a staff conference; or on how it is to conduct the internal diagnostic processes on which the Superintendent may rely in carrying out his statutory duties relating to the determination of competency to stand trial.

Congress has by statute[1] vested exclusively in the Superintendent of St. Elizabeths Hospital the duty to certify whether an accused is competent to stand trial; the District Court is not bound by that

1. 24 D.C.Code § 301(b) (1967).

certfication; criteria for that determination are not in issue. The certifying power is vested in an official person, the Superintendent, not his staff. The diagnostic process and internal administrative steps by which the Superintendent informs himself in the performance of his statutory duty is a medical matter totally beyond the power and surely beyond the competence of judges of this court or any court. The Superintendent of St. Elizabeths may reach his conclusions by reading the medical record, by personally interviewing the accused, by consulting with staff. members or any other means which in his professional judgment as a physician seem proper.[2] Indeed a very large number of such certifications are made by the Superintendent without any staff conference being held.[3] His certificate can, of course, be challenged and he can be cross-examined in the District Court hearing; any alleged infirmities in his diagnostic process may be explored.

To me it is not simply irregular for judges to instruct physicians on how they should make a diagnosis; in my view the order entered by Judges Bazelon and Robinson on October 17, 1968 commanding the Superintendent of St. Elizabeths Hospital to hold a conference and make a tape recording of that .conference was a flagrant abuse of judicial power.[4] Except for the fact that the issue was probably moot as a practical matter when that order was entered [5] and is perhaps

2. The internal diagnostic process is not dissimilar to the institutional decisions rendered by administrative agencies which have consistently withstood Constitutional attack. *E.g.*, United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed.2d 1429 (1941); Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); *cf.* Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). In the *Morgan* cases the Supreme Court insulated the administrative process from indiscreet visitations by the unfriendly eye. The principle of the *Morgan* cases applies with added force here since a staff conference is not in any sense a hearing of an adjudicatory nature. *See also* Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).

3. It seems clear, and indeed there have been no express contentions to the contrary, that the holding of a medical staff conference at St. Elizabeths Hospital lies entirely within the *discretion* of the hospital Superintendent and that the need for such a conference has traditionally been determined on a case by case basis. "Of some 570 reports made to the courts of the District of Columbia since January 1, 1968 with respect to persons committed under 24 D.C.Code 301, 300 reports were made after a staff conference and approximately 270 were made without a staff conference." (Supplemental Memorandum for Saint Elizabeths Hospital, *Amicus Curiae*, at 6; accord, id. n. 4).

4. The Court's order was tantamount to a writ of mandamus since it commanded the District Court to direct the hospital to conduct a medical staff conference. "The traditional use of the writ in aid of appellate jurisdiction both at common law and in the federal courts has been to confine an inferior court to a lawful exercise of its prescribed jurisdiction * * *." Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943). The issuance by an appellate court of a mandamus against a District Court is erroneous in the absence of any substantial allegation of a usurpation or flagrant abuse of power. *Compare* Will v. United States, 389 U.S. 90, n. 10, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967), *with* Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234 (1964). "The writ of mandamus is not to be used when 'the most that could be claimed is that the district courts have erred in ruling on matters within their jurisdiction.'" *Id.* at 112, 85 S.Ct. at 239, quoting Parr v. United States, 351 U.S. 513, 520, 76 S.Ct. 912, 100 L.Ed. 1377 (1956). "(T)he fact this case involves a criminal prosecution has contextual relevance" which further militates against the use of mandamus. Will v. United States, *supra*, 389 U.S. at 100, n. 10, 88 S.Ct. at 276 n. 10. Of equal importance is that courts will not interfere by way of mandamus except to enforce merely ministerial acts required by law to be performed. *See* note 3 *supra*.

5. On July 30, 1968 the Superintendent of St. Elizabeths Hospital fulfilled his

legally moot now,[6] I would move this court, *en banc,* to vacate and set aside the order of October 17, 1968.

All of the orders entered in this case arise out of Petitioner's desire to have his counsel present at the Medical Staff Conference and he relies heavily on Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) and United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926 (1967). It is clear, however, that those decisions and other right-to-confrontation cases are totally inapposite. Noting that "the requirements of due process frequently vary with the type of proceeding involved" the Supreme Court, in Hannah v. Larche, 363 U.S. 420, 440, 80 S.Ct. 1502, 1513 (1960), concluded that the right to confrontation did not apply to investigations conducted by the Civil Rights Commission. As in *Hannah,* the Medical Staff Conference here

> is purely investigative and fact-finding. It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short * * * (it) does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its existence is to find facts * * *.
>
> * * * * * * * * * *
>
> [I]t investigates and reports leaving affirmative action, if there is to be any, to other governmental agencies where there must be action *de novo.*

*Id.* at 441, 452, 80 S.Ct. at 1514, 1520 (Emphasis supplied.)

There is no legal basis for equating a Medical Staff Conference to a "confrontation" either in the traditional sense or within the meaning of *Wade-Gilbert.* Those cases apply only to critical prosecutive stages. The vice of requiring a sensitive diagnostic process to be conducted as though it were an adversary matter seems too obvious to need discussion. The value of that process is undermined by anything which inhibits the free exchange of views; the integrity of the process makes privacy imperative. The presence of a lawyer for the patient at a staff conference would obviously inhibit the free expression and exchange of ideas which normally occurs. The check on the processes by which the Superintendent of the Hospital reaches his conclusion is the power to cross examine him.

The legal method of inquiry is unsuited to the medical investigation to be conducted. Medical diagnostic procedures should not be inhibited by non-medical notions of procedural·"due process." Indeed it is far more consonant with the sympathetic relationship existing between Doctor and patient that the medical inquiry be divested as much as possible of an adversary character. Our approach should encourage an attitude of cooperation rather than partisanship; emphasis must be on the common pursuit for an objective, uninhibited inquiry, uncluttered by the techniques and devices of the courtroom.

statutory duty under 24 D.C.Code § 301 (b) (1967) when he filed a certificate advising that the Defendant was competent to stand trial.

6. We have been informed that, pursuant to this Court's most recent order, St. Elizabeths Hospital on October 24, 1968, at 10:30 A.M. held a medical staff conference which was recorded on audio tape. Supplemental Memorandum for St. Elizabeths ·Hospital, *Amicus Curiae,* at 2.